UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————

JOHN SHEA,                                  )
                                            )
            Plaintiff,                      )
                                            )
            v.                              )        Civil Action No. 12-12420-JLT
                                            )
CAROLYN W. COLVIN,[1]                       )
Acting Commissioner of Social Security,     )
                                            )
            Defendant.                      )
———————————————————————)

**REPORT AND RECOMMENDATION ON SHEA'S MOTION TO
REVERSE THE COMMISSIONER'S DECISION AND DEFENDANT'S
MOTION TO AFFIRM THE COMMISSIONER'S DECISION**
[Docket Nos. 15, 21]

September 11, 2013

Boal, M.J.

        This is an action for judicial review of a final decision by the Commissioner of the Social

Security Administration ("Commissioner") denying the application of Plaintiff John Shea

("Shea") for Supplemental Security Income ("SSI").  Shea asserts that the Commissioner's

decision denying him such benefits – memorialized in a November 22, 2011 decision of an

administrative law judge ("ALJ") – is in error, [Docket No. 15], and the Commissioner, in turn,

has moved to affirm [Docket No. 21].  This Court heard oral argument on August 14, 2013.  For

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Colvin is automatically substituted as the defendant.

the following reasons, this Court recommends[2] that the District Court deny Shea's motion and grant the Commissioner's motion.

I.      FACTS AND PROCEDURAL HISTORY

     A.     Procedural History

     Shea filed an application for SSI on February 8, 2010.  (AR 152-59).[3]  He alleged disability since January 1, 1981, due to a number of physical impairments.  (AR 152, 188).  The Social Security Administration ("SSA") denied his application on April 12, 2010 (AR 94-96), and on reconsideration.  (AR 100-02).  Shea requested a hearing before an ALJ, which was held on August 23, 2011.  (AR 30-91).  Shea appeared pro se.

     On November 22, 2011, the ALJ issued a decision denying Shea's request for SSI.  (AR 12-29).  The ALJ found that Shea was not disabled from the date of his SSI application through the date of the ALJ's decision.  Shea requested review of the ALJ's decision before the Appeals Council, which was denied on November 29, 2012.  (AR 1-4).

     B.     Background

     As an adult, Shea had applied for SSI benefits on at least two occasions prior to the subject application. [4]  In March 1994, Shea applied for and was awarded SSI based on a

---

[2] On January 25, 2013, the District Court referred the present motions to this Court for a report and recommendation.  Docket No. 7.

[3] "AR _" refers to the Administrative Record.  Docket No. 14.

[4] The record also shows a number of SSI applications when Shea was a minor.  In March 1981, when Shea was fifteen, an application for child SSI payments was filed on his behalf.  (AR 15).  The application was denied.  In May 1983, just shy of eighteen, he filed an application for SSI.  (Id.).  The application was denied and, after an ALJ issued an unfavorable ruling, there was no further appeal.  In October 1992, the March 1981 application was revived and granted on the basis of a Supreme Court decision.  (Id.).  However, after Shea was incarcerated in or about September 1993, his SSI benefits terminated.

personality disorder and substance abuse.  (AR 15).  Shea was incarcerated sometime in or about

early 1995 and his SSI payments terminated effective December 1, 1996.  In August 2009, Shea,

on pre-release from his prison sentence, filed another SSI application.   (Id.).  The application

was denied, and there was no appeal.

Shea was forty-four years old at the time of the alleged disability onset date.  (AR 28, 54-

55, 182).  He obtained a GED and has no past relevant work experience.  (AR 28, 55, 81, 189).

C.      Medical Evidence[5]

On September 21, 2009, Jason Worcester, M.D., examined Shea and completed a report

for the Massachusetts Emergency Aid to Elders, Disabled, and Children program.  (AR 293-

301).  Dr. Worcester noted that Shea did not complain of any psychiatric issues, and that Shea's

appearance/attitude/behavior, orientation, mood and affect, speech, thought process and content,

perceptions, and cognition were all normal.  (AR 297).  Shea was not taking any medications for

any mental health issues.  (AR 298).

Orthopedic treatment notes from the Boston Medical Center dated March 9, 2010,

describe Shea as being "alert and oriented" with a "slightly odd" and "flat" mood/affect.  (AR

336-37).

During an examination with the Cambridge Health Alliance on May 26, 2010, Shea

reported that he had just started treatment for depression at North Suffolk Mental Health ("North

Suffolk").  (AR 413, 491, 515).  Shea reported symptoms of depression and anxiety.  (AR 516).

---

[5] Shea only raises issues pertaining to the development and review of evidence of his
mental impairments.  Accordingly, the Court does not address evidence of Shea's physical
impairments.

3

His primary care physician, C. Jasmine Karalakulasingam, M.D., noted that Shea had an odd affect, with at times rapid speech and scattered thoughts.  (AR 413, 491).

On follow up examination on June 29, 2010, Shea reported being depressed, and Dr. Karalakulasingam noted that he had rapid, but not pressured speech.  (AR 512).  Shea also recounted that he had gone to multiple specialists for pain and that he "wants to get disability." (AR 512).

Shea underwent a therapy and psychopharmacology evaluation at North Suffolk with Daniel Debowy, M.D./Ph.D., on July 28, 2010.  (AR 539-41).  Dr. Debowy noted that "despite a strong belief that he has always had psychiatric issues of some sort, and his conviction that these were a main driver of his law breaking in his adolescence and twenties, he has never been treated or accepted treatment inside prison or outside of it."  (AR 539).  Shea complained of worsening insomnia since his release from prison, with low energy, poor concentration, poor appetite and weight loss, pessimistic thoughts on life, occasional passive suicidal ideation, anxiety, and social isolation.  He noted that on occasion he had mild paranoid ideation about strangers in crowds, which has caused him to leave buses or trains before arriving at his destination.  Shea also reported that several times in the last few months he had periods where he was distractible, impulsive, energetic without feeling motivated or happy, irritable, and had rapid speech and anxiously racing thoughts.  He noted that his goal was to go to college and get an associate's degree so that he could get a job that would provide for him and his girlfriend.

On mental status examination, Dr. Debowy reported that Shea was fairly groomed, mildly diaphoretic, and casual.  (AR 540).  He described Shea's mood as "not normal."  He reported that Shea's affect was mildly anxious and energized and that he exhibited mild psychomotor agitation and mildly increased speed of speech throughout the evaluation.  Shea

4

had fair-to-poor eye contact and linear thought process.  His thought content was "perseverative

that only Klonopin could help him be normal," and he denied audio-visual hallucinations, as well

as paranoid, homicidal, or suicidal ideation.  (Id.).  Memory and concentration was fair to poor,

orientation was full, and insight/judgment was poor, but partially open to discussion.

Dr. Debowy determined, as an Axis I diagnosis, that Shea suffered from bipolar affective

disorder II versus substance induced mood disorder; opiate dependence, in remission on low

dose replacement medication; and history of polysubstance abuse.  (AR 540).  He noted "Rule

out Cluster B structure" at Axis II.  (AR 540).  He assigned Shea a Global Assessment of

Functioning ("GAF") Score of 60.[6]   For treatment, Dr. Debowy prescribed a low dose of Abilify

to stabilize Shea's mood, with consideration of a longer-term mood stabilizer if Abilify proved

effective.  (AR 541).  He also advised Shea to continue therapy.

Shea underwent treatment for substance abuse disorder at CAB Health and Recovery

Services ("CAB") in November and December 2010. (AR 542-43).

At his hearing, Shea submitted a one-page proposed treatment plan/comprehensive

clinical assessment from Arbour Counseling Services ("ACS"), dated August 12-13, 2011. (AR

47, 545).  The assessment, completed by a licensed mental health counselor, indicated that Shea

had an active need for assistance in the following areas: criminal/legal, trauma history, and

substance abuse history.  (AR 545).

---

[6] The GAF Scale is used for reporting a clinician's judgment of the individual's overall
level of functioning and concerns psychological, social and occupational functioning and, unless
otherwise noted, refers to the level of functioning at the time of evaluation.  See Am. Psychiatric
Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-33 (4th ed., text
revision 2000) (hereinafter DSM-IV TR).  GAF scores in the 51-60 range indicate "moderate
symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate
difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or
co-workers)."  DSM-IV TR at 34.

After the ALJ's decision, Shea, then represented by counsel, submitted to the Appeals Council additional records from ACS, including additional pages from the August 12-13, 2011 assessment.  (AR 551-71).  In those records, Shea reported feeling hopeless about working secondary to his long criminal history.  (AR 554).  On mental status examination, Shea exhibited normal appearance, full orientation, high energy, intense eye contact, adequate self-care, fair concentration, fair insight, average intelligence, and adequate impulse control.  (AR 556).  Shea displayed a normal memory, logical thoughts, a fair ability to abstract, cooperative behavior, seldom auditory hallucinations, and no delusions or dissociations.  However, he further exhibited an anxious effect and mood, poor judgment, rigid/tense posture, pressured speech, erratic psychomotor activity, and too many and grandiose ideations.  Additionally, Shea reported fleeting suicidality, no homicidality, normal appetite, irritability, and early/frequent awakening from sleep.  The mental health counselor diagnosed Shea with post-traumatic stress disorder ("PTSD"), polysubstance dependence, and antisocial personality disorder.  (AR 560).  She assigned him a GAF Score of 45 and advised further psychiatric evaluation.  (AR 560).[7]

Progress notes dated August 19, 2011 describe Shea as engageable, with pressured speech, and an affect which was less constricted than the previous week.  (AR 565).  An August 26, 2011 session focused on Shea's potential struggles with male authority figures.  (AR 566).  Shea reported fair mood and was "irritable at baseline."  (AR 566).  The counselor noted that Shea appeared hyperverbal, with pressured speech and constricted affect.  (AR 566).

---

[7] A GAF score in the 41-50 range indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV TR at 34.

The next progress notes are dated November 12, 2011.  (AR 567).  Shea's listed symptoms were panic attacks, depression with crying spells, and rapid speech.  (AR 567).  No change was noted in his condition.  Subsequent treatment notes from November 14, 2011 through December 17, 2011, list rapid speech, panic attacks and anxiety as Shea's symptoms.  (AR 568-74).  No change was noted in his condition other than on December 17, 2011, when the clinician noted that "talking helps."  (AR 568-74).

Shea also submitted to the Appeals Council a mental residual function capacity form dated January 7, 2012, and signed by Diane Germano, P.M.H., and Michael Pearlman, M.D. (AR 550-51).  These providers checked boxes indicating that Shea had a "Category IV" limitation in every area of work-related mental functioning.  (AR 549-50).  The form defines Category IV as precluding performance of activities for fifteen percent or more of an eight-hour workday.  (AR 549).

C.     Shea's Function Reports And Testimony

In a March 5, 2010 Function Report, Shea reported that he watches television and movies, reads the newspaper and books, talks on the phone, visits with friends, prepares meals, goes outside daily, is able to drive a car and use public transportation, and infrequently shops. (AR 209, 213-15).  He did not indicate any problems with memory, concentration, understanding, following instructions, or getting along with others.  (AR 216-17).  He did note difficulty with task completion.  (AR 216).  With respect to stress tolerance, Shea reported that he has hyperthyroidism, which affects his mood and causes shortness of breath.  (AR 217).

In a July 13, 2010 Function Report, Shea reported daily activities including watching television, preparing meals, going outside, driving, shopping, socializing, and attending doctors visits.  (AR 232, 234-36).  He reported that his hyperthyroidism affects his mood and appetite at

times.  (AR 237).  Shea reported difficulty with task completion, concentration, and handling

stress.  (AR 237-38).  He indicated difficulty getting along with others, but noted that he gets

along with authority figures "as well as anybody."  (AR 237-38).  He indicated no problem with

memory, understanding, or following instructions.  (AR 237).

    At his August 23, 2011 hearing, Shea testified that he has depression, anxiety, and

PTSD.  (AR 63).  He testified that he has bad nightmares, which wake him up at night.  (Id.).

He testified that he has flashbacks, which interfere with his otherwise "decent" ability to pay

attention.  (Id.).  He testified that he had tried taking Abilify before he "wound up going away."

(AR 64).[8]

    Shea testified that he takes Gabapentin, which helps his physical symptoms and his

depression.  (AR 80).  He explained that when he takes it "I definitely feel much better.  I – if

I'm sad and depressed and stuff, taking my Gabapentin lifts it for some time, you know."  (Id.).

He noted that a psychiatrist he had seen at North Suffolk had recommended Gabapentin, which

he was already taking through his orthopedist.  (Id.).

    Shea testified that he had undergone a psychiatric evaluation with Dr. Debowy at

North Suffolk.  (AR 85-86).  He testified that he had begun mental health and drug counseling at

ACS, and that had seen a counselor there a few times.  (AR 64, 85-86).

    Shea further testified that he watches television, reads books, walks to the local store, and

is able to drive.  (AR 70-72).

--------

[8] It appears that Shea was referring to time spent in prison in early 2011 for violating his
parole.  (AR 55-56, 85-86).

II.    STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence.  See 42 U.S.C. §§ 405(g) and 1383(c)(3).  Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion.  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  The Supreme Court has defined substantial evidence as "more than a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citation and internal quotation marks omitted).

The resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts.  Rodriguez, 647 F.2d at 222; Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987).  A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim.  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).  In the end, the court maintains the power, in appropriate circumstances, "to enter . . . a judgment affirming, modifying, or reversing the [Commissioner's] decision" or to "remand [ ] the cause for a rehearing." 42 U.S.C. § 405(g).

III.    ANALYSIS

An individual is entitled to SSI if he can show both disability and financial need.  See 42 U.S.C. § 1381a.  The ALJ denied Shea's SSI application solely for lack of disability.

A.      Disability Standard And The ALJ's Decision

The Social Security Act (the "Act") defines disability, in part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  See also 42 U.S.C. § 1382c(a)(3)(A) (similar).  An individual is considered disabled under the Act

> only if his physical and mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  See generally Bowen v. Yuckert, 482 U.S. 137, 146-49 (1987).

In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.

> Second, does the claimant have a severe impairment?  A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of severity, he is automatically not disabled.

> Third, does the claimant have an impairment equivalent to a specific list of impairments in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.
> . . . .

> Fourth . . . does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so he is disabled; if not he is not disabled.

Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

At step one, the ALJ concluded that Shea had not engaged in any substantial gainful activity since February 8, 2010, the date of his SSI application.  (AR 18).

At step two, the ALJ found that Shea had several severe physical impairments but concluded that his mental impairments were non-severe.  (AR 18-19).  As to his mental impairments, the ALJ explained that Shea's treatment notes indicate no psychiatric issues until May 2010, when Shea reported that he was seeking treatment at North Suffolk for his depression.  Because Shea did not make a claim for mental impairment prior to his initial and reconsideration reviews, there was no Disability Determination Service assessment to consider.  (AR 19).

The ALJ nevertheless analyzed the pertinent medical evidence of record, particularly Dr. Debowy's evaluation notes.  As recounted by the ALJ, Dr. Debowy's evaluation indicated that Shea reported no previous psychiatric treatment, insomnia, low energy, poor concentration and appetite, occasional suicidal ideation, anxiety in crowds, isolating behavior, distracabilty, and racing thoughts.  (Id.).  He identified Dr. Debowy's diagnoses: substance-induced mood disorder, opiate dependence (in remission on low dose replacement med), and polysubstance abuse.  The ALJ noted Shea's treatment plan of Abilify and therapy.  He explained that Shea "has no further mental health treatment notes, other than his treatment for substance abuse disorder in November 2010 at CAB Health Recovery Services and a proposed treatment plan from [ACS] dated August 14, 2011."  (Id.).  Turning to Shea's hearing testimony, the ALJ noted that Gabapentin makes Shea feel better by helping his pain as well as lifting his depression.  "To

11

the extent that [Shea] exhibits signs of depression, anxiety, and PTSD," the ALJ concluded,

"there is no indication that [his] psychiatric symptoms are of such duration or intensity to

interfere with his ability to perform work activities."  (Id.).

The ALJ based this finding on consideration of the so-called "paragraph B" criteria listed

in 20 C.F.R. 416.920a.[9]  (Id.).  Under this "special technique," the ALJ must evaluate the degree

of a claimant's mental impairment based on four broad functional areas: activities of daily living;

social functioning; concentration, persistence, or pace; and episodes of decompensation.  20

C.F.R. § 416.920a(b), (c)(3).

As to daily living, the ALJ found that Shea had no limitation.  He noted Shea's testimony

that he watches television, reads books, walks to the local store, and drives.  (AR 20).  He also

cited Shea's Functional Reports, in which Shea stated that he talks on the phone, reads the

newspaper and books, goes out daily, and indicated no difficulties with personal care.  The ALJ

found Shea's habits to be consistent with no restriction in daily living.  (Id.).

As to social functioning, the ALJ found only a mild limitation.  (Id.).  He identified

Shea's claims of anxiety in crowds and on public transportation, and his tendency to isolate.  The

ALJ further noted, however, that Shea lived with a friend, and reported shopping in stores and

talking with friends on the phone or in person.  Thus, the ALJ concluded that Shea's mental

impairments pose only minimal limitations on his social functioning.  (Id.).

The ALJ similarly found only a mild limitation on Shea's concentration, persistence, and

pace.  (Id.).  He noted Shea's reports of poor concentration, impulsive behavior, and energetic

_____

[9] The paragraph B criteria are implicated in the second and third step of the sequential
disability analysis.  Balaguer v. Astrue, 880 F. Supp. 2d 258, 267 (D. Mass. 2012); 20 C.F.R. §
416.920a; 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.09(A).

periods without motivation.  He also identified Shea's testimony regarding nightmares and flashbacks, as well as the treatment notes indicating odd affect, rapid speech, and scattered thoughts.  The ALJ further explained, however, that Shea testified to having a "decent" attention span and reported in his Function Reports that he is able to finish tasks and follow instructions. (Id.).  On this basis, he found that Shea's mental impairments result in only minimal limitations in these areas.  (Id.).

Turning to the fourth factor, the ALJ found, based on the medical evidence, that Shea had not experienced any episodes of decompensation of extended duration.  (Id.).

Based on the foregoing analysis, the ALJ concluded, "[b]ecause [Shea's] medically determinable mental impairments cause no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation…they are non-severe."[10]  (Id.).

Having found that that Shea's mental impairments were not severe, the ALJ did not progress further to steps three through five with respect to those impairments.[11]  (Id.).

B.     Shea's Challenges To The ALJ's Decision

Shea argues that the ALJ's decision is in error because the ALJ failed to assist Shea, a pro se claimant with documented mental health impairments, develop his claim.  Docket No. 16 at 2. Specifically, Shea contends that the ALJ failed to obtain and consider the North Suffolk records, his prior SSI applications, and the ACS records.  Id. at 11-12.

---

[10]  See also 20 C.F.R. § 416.920a(d)(1) ("if we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.").

[11]  The ALJ did proceed to find that, although Shea had severe physical impairments, he had a residual functional capacity to perform work available in the national economy.  (AR 21-29).  Shea does not dispute these findings.

Social Security proceedings are non-adversarial.  <u>Sims v. Apfel</u>, 530 U.S. 103, 110-11 (2000).  In this posture, while the claimant bears the burden of proof on the issue of disability, the ALJ has a duty "to develop an adequate record from which a reasonable conclusion can be drawn."  <u>Ribeiro v. Barnhart</u>, 149 Fed. App'x 7, 7 (1st Cir. 2005); <u>see also</u> <u>Viveiros v. Astrue</u>, No. 10-11902-DJC, 2012 WL 4104794, at *12 (D. Mass. Sept. 19, 2012).  This responsibility increases where the applicant is without counsel, <u>Evangelista v. Sec'y of Health and Human Servs.</u>, 826 F.2d 136, 142 (1st Cir. 1987), or is obviously mentally impaired.  <u>Deblois v. Sec'y of Health & Human Servs.</u>, 686 F.2d 76, 81 (1st Cir. 1982); <u>see</u> <u>also</u> <u>Farley v. Astrue</u>, No. 06-221-P-H, 2007 WL 4608723, at *2 n. 5 (D. Me. Dec. 28, 2007).

To prevail on such a claim, the claimant must show that the ALJ's failure to develop the record was unfair or prejudicial.  <u>Faria v. Commissioner of Soc. Sec.</u>, 187 F.3d 621 (table), 1998 WL 1085810, at *1 (1st Cir. Oct. 2, 1998).  Prejudice is demonstrated by showing that "the additional evidence might have led to a different decision."  <u>Gaeta v. Barnhart</u>, No. 06–10500–DPW, 2009 WL 2487862, at *6 n. 4 (D. Mass. Aug. 13, 2009) (quoting <u>Newton v. Apfel</u>, 209 F.3d 448, 458 (5th Cir. 2000)).

This Court finds that the ALJ developed an adequate record.  With respect to the North Suffolk records, Shea reported that he had recently undergone a psychiatric evaluation in July 2010 with Dr. Debowy.  (AR 85-86).  The ALJ confirmed with Shea that this report was in the record.  (AR 85-87).  The administrative record indicates that Dr. Debowy's evaluations are inclusive of Shea's treatment at North Suffolk.  (AR 85-86, 539).  Dr. Debowy's evaluation specifically references the counseling services provided by Julie James, Shea's caseworker at North Suffolk, and makes independent and comprehensive findings regarding Shea's mental

health.  (AR 85-86, 539).  In his written decision, the ALJ addressed and evaluated these medical

records.  (AR 19-20).

Shea further contends that the ALJ should have incorporated his prior SSI files into the

record, specifically his 1994 SSI award.  Docket No. 16 at 11.  This Court disagrees.  These

benefits were suspended and subsequently terminated in December 1996 due to Shea's

incarceration in early 1995 on a fifteen-year sentence.  See 20 C.F.R. §§ 416.1325, 416.1335.

Assuming that Shea had a disabling personality disorder in 1994, it does not necessarily follow

that his disorder remained disabling through his 2010 application date.  See Stubbs–Danielson v.

Astrue, 539 F.3d 1169, 1172 (9th Cir. 2008) (SSA not required to presume previous disability

has continued through non-medically related termination of benefits); see also Bard v. Astrue,

No. 12-22-cv-NT, 2012 WL 5258197, at *5 (D. Me. Sept. 28, 2012) (ALJ did not err in failing to

consider claimant's receipt of benefits prior to incarceration).  The evidentiary value of the 1994

file is diminished by the fact that the Commissioner denied an SSI application in August 2009,

which Shea did not appeal.  (AR 15).  Given the marginal probative value of the 1994 file, the

ALJ reasonably relied on the evidence of record in determining that Shea's mental impairments

were not severe.

Shea also argues that the ALJ should have obtained the additional ACS records.  At the

August 23, 2011 hearing, Shea noted that he had recently started counseling at ACS and

presented a one-page proposed treatment plan/comprehensive clinical assessment dated August

12-13, 2011.  (AR 47, 545).  The face of the document indicated that Shea was actively seeking

help with criminal/legal issues, his trauma history, and his substance abuse history.  (AR 545).

However, the record before the ALJ already spoke to these issues, and the ALJ expressly

addressed them in finding that Shea's mental impairments were not severe.  (AR 15, 19).

Accordingly, this Court finds that the ALJ developed an adequate record.

C.      The Appeals Council's Decision To Deny Review

Shea further argues that the Appeals Council's decision to deny review of the ALJ's decision was in error.[12]

In Mills v. Apfel, 244 F. 3d 1, 5 (1st Cir. 2001), the First Circuit held that judicial review of an ALJ's decision must be based "solely on the evidence presented to the ALJ."   The First Circuit noted, however, that the Social Security regulations allow a claimant to introduce new and additional evidence upon a request for Appeals Council review.  See id. at 4.  Recognizing a circuit split on the standard of review, the Mills court addressed this situation by holding that a reviewing court may consider additional evidence submitted to the Appeals Council where the Appeals Council's refusal to review the ALJ decision was based on "an egregiously mistaken ground."  See id. at 5.  The Court explained:

> the Appeals Council may have 'made a mistake' in refusing to consider new evidence presented to it, depending on the ground it gave . . .   In such a situation, if the Appeals Council mistakenly rejected the new evidence on the ground that it was not material, we think a court ought to be able to correct that mistake . . ."

244 F.3d at 5.  The Court provided for such limited review even though it assumed

> that the Appeal's Council's refusal to review would be effectively unreviewable if no reason were given for the refusal.  This is not a serious anomaly; there is reason enough to correct an articulated mistake even though one cannot plumb the thousands of simple 'review denied' decisions that the Appeals Council must issue every year.

---

[12] At oral argument, Shea's counsel argued this point for the first time.  The argument is not contained in his brief.  The Court could therefore treat this argument as waived.  Crocker v. Astrue, No. 07-220-P-S, 2008 WL 2775980, at *3 n. 5 (D. Me. June 30, 2008); Christopher v. Mount Snow, Ltd., No. 95-10352-MLW, 1996 WL 590738, at *2 n. 1 (D. Mass. Sept. 24, 1996). However, this Court addresses the argument in the event the District Court considers it to be preserved.

Id. at 6.  In Mills, the Appeals Council stated that the evidence was "consistent" with the existing records and therefore did not justify disturbing the ALJ's decision.  The Court found that such assessment was owed "great deference" even though "it was not beyond review in extreme cases."  Id.  In Mills, after reviewing the new evidence, the Court found that the language "was not perfectly apt" but, after speculation as to what the Appeals Council may have meant, found the Appeals Council action to be entirely reasonable.  Id. at 7.

Since Mills, courts have offered seemingly disparate interpretations of the "egregiously mistaken" standard of review.  Compare  Anderson v. Astrue, 682 F. Supp. 2d 89, 98 (D. Mass. 2010) (Appeals Council decision mistaken and oversimplified but reasonable); Gaboury v. Astrue, No. 08-319, 2009 WL 2971535, at *13 (D.R.I. Sept. 16, 2009) (Appeals Council's "boilerplate" decision not egregiously mistaken); Thibodeau v. Astrue, No. 08-cv-308-JD, 2009 WL 903851, at *5 n. 6 (D.N.H. Mar. 31, 2009) (same) with Brennan v. Barnhart, No. 05-123-P-H, 2006 WL 217987, at *2 (D. Me. Jan. 25, 2006) (Appeals Council decision egregiously mistaken where new evidence supported a basis for changing the ALJ's conclusion); Ortiz Rosado v. Barnhart, 340 F. Supp. 2d 63, 67 (D. Mass. 2004) (impossible to determine whether Appeals Council decision was egregiously mistaken where it did not provide reasons); St. Pierre v. Massanari, No. 01-99-P-C, 2001 WL 1502571, at *3 (D. Me. Nov. 26, 2001) (Appeals Council statement is not reasonable and the new material evidence does in fact require a different outcome).

This Court agrees with much of the sentiment expressed by the Ortiz Rosado court.  In that case, the court noted that "if the Appeals Council is going to be afforded a highly protective standard, i.e. egregiousness, by which its decisions are to be reviewed, it must offer more than a

boilerplate justification for its decision." Ortiz Rosado, 340 F. Supp. 2d at 68.  Nevertheless, the court also noted that "even a cursory review of the evidence proffered by Plaintiff to the Appeals Council reveals it was new and material and, perhaps, contrary to the weight of the other evidence." Id.

Here, the Appeals Council considered the additional evidence submitted by Shea, but concluded that it did not provide a basis for changing the ALJ's decision.  (AR 2).  This Court finds that the Appeals Council's denial of review of the ALJ's decision was not egregiously mistaken.

The new ACS evidence contained (1) the full August 12-13, 2011 comprehensive clinical assessment and subsequent progress reports; and (2) the mental residual functional capacity evaluation signed by Diane Germano, P.M.H. and Michael Pearlman, M.D.  (AR 549-74).

The clinical assessment and progress reports were not of sufficient weight to overcome the deference owed to the Appeals Council.  In the assessment, an ACS clinician diagnosed Shea with PTSD, polysubstance dependence, and antisocial personality disorder.  (AR 560).  She assigned him a GAF Score of 45 and recommended additional psychiatric evaluation.  (AR 560).  The progress reports, dated between August 19, 2011 and December 17, 2011, indicate that Shea had "problems" with PTSD and polysubstance abuse.  (AR 565-74).  They do not mention any potential problem with antisocial personality disorder.  The progress reports list Shea's symptoms to include panic attacks, rapid speech, some anger, depression with crying spells, and/or anxiety.  (Id.).

The record before the ALJ spoke to these issues and the ALJ relied on this evidence in forming his decision.  (AR 19-20).  The ALJ specifically addressed Shea's polysubstance abuse, and found nothing in the record indicating that Shea's history of substance abuse would interfere

with his ability to perform work.  (AR 19).  The ALJ also discussed Shea's potential PTSD, anxiety, and depression.  (Id.).  The ALJ applied the "paragraph B" criteria and found that Shea's corresponding psychiatric symptoms were not of such duration or intensity to interfere with his ability to perform work activities.  (AR 19-20).  Nothing in the assessment or progress reports is contrary to these conclusions.

The January 7, 2012 residual functional capacity evaluation is potentially the most significant piece of new evidence.  The evaluation indicates restrictions in Shea's ability to work. (AR 549-50).  Ms. Germano and Dr. Pearlman found Shea to exhibit "Category IV" limitations on all work-related abilities including: understanding and memory; sustained concentration and memory; social interaction; and adaptation.  (AR 549-50).  A Category IV limitation precludes performance for fifteen percent or more of an eight-hour work day.  (AR 549).

However, the January 7, 2012 RFC evaluation was issued after the ALJ's November 22, 2011 decision.  Pursuant to 20 C.F.R. § 416.1470(b), "[i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. § 416.1470(b).  There is no indication that the RFC evaluation relates to a time period before the ALJ's decision.[13]  At oral argument, counsel for Shea explained that he submitted the RFC form to ACS after the ALJ's decision.

The evaluation is also at odds with the other evidence of record for the relevant time period.  The evaluations of Drs. Worcester, Karalakulasingam, and Debowy do not reveal any limitation in Shea's ability to work.  (See AR 297-98, 413, 491, 512, 539-41).  Shea's function

---

[13]  The same is true for the ACS progress reports dated between November 26, 2011 and December 17, 2011.

reports reveal that his impairments do not limit his memory, understanding, or his ability to follow instructions.  (AR 216, 237).  Shea also testified that he had an overall "decent" attention span.  (AR 63).  Under such circumstances, the Appeals Council's decision was not egregiously mistaken.[14]

IV.    CONCLUSION

For the foregoing reasons, this Court recommends that the District Court DENY Shea's motion to reverse and GRANT the Commissioner's motion to affirm.

V.    REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hospital,199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, 116 F.3d 962 (1st Cir.

---

[14] To the extent that Shea's mental impairments have worsened since the time of the ALJ's decision, he may submit a new SSI application.  See Auger v. Astrue, 792 F. Supp. 2d 92, 98 (D. Mass. 2011).

1997); <u>Pagano v. Frank</u>, 983 F.2d 343 (1st Cir. 1993).


/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge
